We have six cases on the calendar this morning, four of them patent cases, two from district courts and two from the PTAB. A tax case from the Court of Federal Claims and a veterans case. The veterans case and one of the patent cases will be submitted only in the briefs and not be argued. Our first case is Enzo Life Sciences v. Elogic and Becton Dickinson, 2018, 1232 and 1233. Mr. Wilcox. Good morning, Your Honor. May it please the Court. Justin Wilcox of the Marist LLP on behalf of Appellant Enzo. The Board committed three critical errors in concluding that the challenge claims of the 197 patent are unpatentable. First, the Board's adherence to the decision lacked any evidence, much less substantial evidence. There is no evidence in the record that nucleic acids in the fish reference are bound in a manner that would render them capable of hybridization. Why not? Your Honor, there's no actual evidence. Since the bases are free, are they not? Are they combined to another? Your Honor, there's no actual evidence that the bases are free to combine. That's the critical error. There's no evidence that they are not. So the reference shows the possibility, capability of binding. Your Honor, under this Court's precedent with respect to inherency, the possibility or probability of hybridization is not enough. It must be unavoidably capable of hybridizing. And the evidence is lacking on that point. Specifically. Isn't, haven't we said that it only has to be inherently capable to the extent disclosed in the patent? Your Honor, the Court has said that. But there's no evidence that the protocol that was performed in the fish reference is the same as the protocol that was performed in the 197 patent. And I guess that's the problem or concern I have with your argument. Your claimed support is coded with something like PPL, right? Correct, Your Honor. And the fish reference, its support is coded by PPL. And your expert explained how, thanks to the coding of PPL, some single-strand DNA can bind to the support along the phosphate backbone of the single-stranded DNA against the positively charged coding on the support. And that's precisely what fish has. The PPL coding, which would allow, why wouldn't that likewise allow fish's single-stranded DNA to rely on its phosphate backbone to bind up against its support? Your Honor, I would disagree with your premise respectfully. Our expert described how another example in the 197 patent using a glass slide in a different coding gamma APS would result in that. But there's no actual evidence in the record that the way that nucleic acids are bound by PLL would render the bases available for hybridization. And that's really the critical problem with the inherency finding here. Petitioner could have done things like try to replicate the fish experiment to show that this would be inherent property, but they didn't do that. So what's wrong with the theory of your disclosure talks about coding your support with PPL, PLL, whatever you want to call it, and fish does the same thing? It uses a PPL coding. Your Honor. And your spec says, and so therefore, you're going to have your single-stranded DNA bind to the support, and it'll be hybridizable. So why wouldn't that same outcome be true for fish using its PPL coding? Your Honor, there are two issues there. Number one, again, there's no evidence that they're the same protocol. That's important. Well, there is no protocol disclosed in your patent, nor is it claimed. It's just have the coding. There's no description of, oh, I need a certain concentration of the PPL, or you have to apply it in this particular manner under this particular temperature. There's nothing like that in your patent spec. It's just about apply the coding. So, again, I'm trying to understand from you, why wouldn't we have the same outcome here? Your Honor, there are two issues there. So there are some differences between the two. First of all, in fish, it describes coding the service at room temperature. In the patent, it actually describes coding the service at 37 degrees Celsius. But going back, there's just no actual evidence that what was done in fish would result in nucleic acids capable of binding because their bases were available. But it only says capable. And the board said you don't need actual hybridization. You just need the capability. And you say in your own spec that coding gives it the capability. So what more would fish need to say? Your Honor, fish would need to say or the petition would need to come forward and show that the bases are actually available for binding in fish. And that isn't in the record. What, you know, Petitioner points to is the 197 patent for that premise. And it's not there. And they also point to another reverence called deal. In fact, their expert relied heavily on deal. The prosecution history of the 197. Correct, Your Honor. The prosecution history describes, you know, codings in general being capable of doing this. But it also described how, you know, once these codings were perfected, they were capable of doing this. But there's no evidence that, you know, the codings in fish were perfected. I'd like to move to the. They said in prosecution history that codings make it capable. Yes, they might be more capable with a perfected coding. But there was nothing in the specification or the prosecution history that says they're not capable with a non-perfected coding. You're already right. There's nothing that says they're not capable. But the level of proof for inherency is very high. And so it's always been Petitioner's burden to come forward and show why the nucleic acids of fish would unavoidably result in the capability to bind. And they haven't showed that. The one way they could do that was to show. Well, that's what nucleic acids do when there's the presence of a complementary base. They bind. Your Honor. It isn't inherency. It's, well, it's inherent in their chemical nature. Your Honor, the board recognized that this is not necessarily the case. The board corrected its original claim instruction to clarify that nucleic acids could be bound in either a form that renders them hybridizable, such as if they're bound by the phosphate backbone, or that they could bound in a way that renders them not capable, such as through their bases. And so our point is. That's right, in which case they wouldn't be available for a complementary binder. Correct, Your Honor. If you wanted to get to another point. Your Honor, I'd just like to put a, just follow up to finish that point, that that's a critical piece that's missing, is evidence showing that actually the bases are available. That's not the record. I'd like to touch on the board's errors with respect to its motivation combined findings. They can't be sustained by substantial evidence. And that's because they either articulated an entirely conclusive reason combined, or no reason to combine the disparate references at all. For example, with the VPK and Ramachandran and Noyes references, the board on Appendix 50 just recites an entirely conclusory statement of how the references could be combined, but never actually says the reason why somebody would do that. Do we even need to get to the VPK if we think that the analysis as it relates to fish was correct? Yes, Your Honor. There are certain claims that would be, that are not affected by the fish reference. And the VPK combination would apply. Which claims are those? Your Honor, those would be the covalent fixation claims. 38, 78, 113, 185, and 218. What are the claims? What are the numbers? Your Honor, those are claims 38, 78, 113. Well, 38 doesn't depend on VPK. 38 fish and gill relate to 38. Your Honor, I'm also going to address those as well. But the critical problem with both the VPK, Ramachandran, and Noyes combinations in the fish and gill references is that there's no glue to hold these together. And that's important because the base reference that the petitioner was pointing to and the board ruled on was a porous system. And that's key because, for example, in Noyes and Gillum, the nucleic acids are bound and hybridized in the pores of a porous support, which is the conventional method at the time. But there's no glue, as this court called it, for jumping to a non-porous system to take those teachings in a porous system and apply them to a non-porous system. And there were problems there because, as our expert pointed out, what the board didn't address. Noyes specifically used this porous system because of the high capacity for binding. That's not the case with a non-porous support. But in any event, the board did not actually address these specific reasons that Enzo articulated for why Skilled Artisan would not have even selected these references for combination in the first place. And that applies to both the VPK, Noyes, and combinations in the fish and Gillum combinations. I'd like to move to the priority arguments. The priority issue is straightforward. The board did not apply the correct legal standard in assessing whether the original application in the priority chain provided a written description for the non-porous limitations. The board didn't assess the level of predictability. It also didn't assess the knowledge of a Skilled Artisan, which is required in this court's opinion of Bill Stout v. Walkopolis. And that created error because the board just jumped straight to analyzing the proof that we put forward in isolation and saying it's not probative. But the board couldn't assess properly whether that proof was probative before first making findings on the level of predictability in the field and the knowledge of a Skilled Artisan. I'd like to see him into my rebuttal time. Before you go, which claims are not covered by the fish-based projections? You're wrong. You said 38 and 78, but those are covered by the fish-Gillum combination. So is there any claim that the VPK-based projections reach that the fish-based projections don't? Your Honor, I believe there are, and I will check and get back to you in my rebuttal on that point. That will be fine. Mr. Stoner. Thank you. Tom Saunders, Professor Dickinson. Can you answer that question first? Are there any that are not covered by the fish-based? No. So the board carefully analyzed the evidence and validated each claim on at least two independent grounds. Every single claim is reached by the fish grounds, with fish and Gillum being used for 38, 78, and 218. And then independently, every single claim is reached by one of the VPK claims. So if we affirmed on the fish grounds, then the priority of VPK or VPK as prior art is irrelevant. Exactly. And so the only argument made today that would go would be those last three dependent claims on the fish grounds, which was about the motivation to combine with Gillum. And the argument that there isn't motivation here is simply incorrect. The board, at page 34 of the appendix, credited our experts' testimony that there was motivation to use the covalent bonds of Gillum because it was known that the covalent bonds were stronger. And so there was an express finding of motivation there. Also, the fact that Gillum and fish were both connecting through the amine groups. In terms of the noise and VPK, there also was evidence on motivation there in terms of the ease of using glass slides and the desirability of having something that could be used with a microscope and would allow for visualization. So again, there was expert testimony on this point. Substantial evidence supports the board's finding there. The board's motivation to combine finding was a little bit odd. I mean, they really just faulted ENSO for focusing on the individual references, but you cite a lot of evidence that you say is substantial evidence, but the board didn't actually cite to that evidence that you pointed to now, did it? Well, I think it's baked into an appendix 50. The board talks about the motivation to combine using noise on easy-to-use, non-porous supports. And at the end of that paragraph, it's citing our petition on pages 52 through 53, and then exhibit 1002, which is our expert declaration, paragraphs 105 through 107 of that declaration. So I don't think that the board's opinion is devoid of this. It was relying on our expert declaration and the motivation that was provided there for the noise VPK ground. Okay, so to the extent that the law requires an articulation of the basis, we have a baked-in standard now? No, no, not a baked-in standard. The motivation on the face of the board's decision, it's talking about the motivation for, you know, specifically says, motivated with a reasonable expectation of success to perform the nucleic acid hybridization experiments described in noise on easy-to-use, non-porous supports, such as the glass slides disclosed in VPK. And what I'm saying is baked in is at the end of that paragraph, it then is citing our expert declaration, which is elaborating on what it means by easy-to-use and the motivation to use the glass slides for visualization there. Counsel, if we don't agree with you that the FISH references dispose of all the claims, then VPK becomes important. And why didn't the board err in finding that the 1983 patent application was sufficient to describe, provide written description for a non-porous solid support? It described polystyrene. It described glass. And non-porous solid support isn't like a chemical genus, where you have to show possession of species within the genus. Non-porous solid support is an item, an object described by its name. And even if it were a genus, species anticipate a genus. And the 1983 patent application does describe certain species. So why wasn't the board in error in not providing entitlement to the benefit of the 1983 patent application? So the board's written description finding, which is reviewed as a question of fact here, was looking at an application that disclosed some supports that happened to be non-porous and other supports that happened to be porous. And doing so in a manner that was not showing anything sort of special or tying together the genus. This is what we've talked about in terms of blaze marks here. Nothing to say we're not just happening to discuss a few supports that happen to be non-porous, but rather we have possession here. Part of our invention is the entire genus of non-porous supports. Our expert talked at page 2783 of the appendix in his deposition about some of the non-porous supports in this genus of all possible non-porous supports that weren't included in the patent. But if you have a claim to a passenger vehicle, and a prior reference or what you want entitlement to describes an automobile, isn't that adequate written description for a passenger vehicle? Isn't it analogous? Here you've got a non-porous solid support, and the 83 patent application describes a couple. The fact that it may also have described porous ones isn't an issue because we're not dealing with porous, we're dealing with non-porous. Right, but it then is going to that broader genus of all of the non-porous solid supports. You're stopping the premise that it's a genus rather than the description of an item. Right, it's a description of an item, but they didn't claim the items they had or those particular attributes. They have gone very broad in their claims to try to get to all of non-porous. And it's clear when you get to their 1985 application that that's an attribute they have. Let me try a different car-related analogy. What if the earlier application disclosed automatic cars and manual stick shift cars, and then four years later they claim manual stick shift cars? That would be a written description violation? No, but I think the key here is they don't disclose it in those terms. We're not saying you have to use the exact terms. The analogy would be they've disclosed six cars, very specific make, model, number. Three of them happen to be automatic, three of them happen to be stick shift. To the extent the specification is saying sort of what do we have possession of, the focus is on transparent or translucent. It's not on the, just switching back to our actual facts here, not on the particular attribute of being non-porous. In any event, your ultimate point is it doesn't matter, because your view is we don't need to deal with VPK. We just need to deal with FISH, because FISH and the other references are radical. Absolutely. That alone gets the full path to affirmance on all of the claims. Can you speak on inherency of the hybridizable limitation in FISH? Right. So the inherency here, our expert, Dr. Nelson, testified about the PLL coding in FISH is going to put down a layer of positive charge amines, and the way that those bind with the nucleic acid is what's driving the inherency, which is that they bind with the phosphate group, the negatively charged phosphate group in the phosphate sugar backbone, which then leaves the bases free for hybridization. And there's no challenge to the board's claim construction here, which is we're not talking about requiring actual hybridization or the hybridization conditions. These claims are designed to read on the articles of manufacture, have hybridizable form, which was construed to mean single-stranded and have the bases available. Well, what's your response to your friend's argument that actually it's a perfected hybridizable form that is being claimed? So I know the board didn't think that there was a limitation that talked about the temperature degrees, but could there be different forms that are disclosed in the two different pieces, the two different references? Right, but the claims themselves are reading on any of these nucleic acids, incredibly broad claims on any nucleic acid in hybridizable form. And so the, you know, straight from the fish reference and the expert testimony about the chemistry and the binding here gets you to the inherency on hybridizable form. And then looking at the deal reference, looking at their own application, the fact that they don't disclose any of the conditions, was confirmation that every time they looked out there to see something with this PLL coding, there was hybridization or these emissions in the prosecution history. But I wonder if we were hearing a claim construction analysis and your argument was we don't infringe because we don't do it exactly the same way. You'd be saying that, well, they inherently disclose the rest of, they inherently claim a narrower claim because the specification is so rife with these details. Well, we're not here on a claim construction analysis because they haven't argued it. And I don't think we would be possibly arguing that the specification is rife with details. The specification is noticeably lacking details. Counsel has mentioned the temperature. That's it that you would find in the specification. It really is this bare reference to PLL and that was what was being touted in the prosecution history here. Thank you, Counsel. We'll hear from the government to intervene on the constitutional issue. How are you doing, Your Honor? Good morning. May it please the court. Dennis Fan on behalf of the government. As you mentioned, on the constitutional issues in the case, as the panel is likely aware, there's a number of pending cases where these same precise constitutional issues have already been raised before the court. And there are also a number of pending appeals where the issues have been properly preserved before the board, before they're raised here. And so this court is obviously within its discretion to decide the issues in any of those cases. It's within its discretion to decide them here. Of course, the government would prefer that the court reach them in a case where they were properly preserved and where the patent owners, in fact, raised the issue before the board. How many of those cases have been argued already? There haven't been any. The most advanced one that I know of right now is Agarwal v. Topgolf, which is number 18-2270 here in the federal circuit. I think it's still awaiting reply briefing. That's the one that's been preserved. The number of cases total that have raised these constitutional issues that have been argued, I think we're approaching 10 or so. I'm not exactly sure on the precise numbers, but as the government has mentioned in its briefing, all of that goes to show that if this court wants to avert the uncertainty of whether or not Interparte's review is constitutional or not, it can certainly do so. And we think that that issue is easily resolved by this court's precedent in PATLEX, which is materially indistinguishable and upheld ex parte reexamination against similar, if not the exact same, types of challenges. And if this court doesn't have questions on the merits of that, I'm happy to see you the rest of my time. Thank you, Mr. Fann. Mr. Wilcox. Let's take some more public time. Your Honor, turning back to the various grounds, I was a little confused. The Fish grounds do cover all of the claims, and the VBK grounds cover all the array claims. I just wanted to point out that there is a certain subset where the obvious combinations are critical, and those would be claims 38, 78, 218, 113, and 185 are not covered by Fish alone, and claims 38, 78, and 218 are not covered by VBK alone. I'd just like to turn back to the inherency issues briefly. I think it's critical that we recognize that the amount of written description and specification required for enablement and written description is different than the standard for finding inherency. Inherency must be an unavoidable result when it comes to the 112 issues. It needs to either reasonably convey for written description or convey without undue experimentation for enablement. With respect to the question of what has to be inherent, didn't the Board specifically find that the temperatures that you referenced before were not required by the claims? Your Honor, you're correct. They're not required by the claims. I'm not identifying the hybridization additions. I'm pointing to the actual protocol used to treat the solid support with the PLL coating. So that's different. The Board was assessing an argument that we made there about the conditions of hybridization and the temperature weren't known. Here, what the temperature I'm pointing to is just with how the PLL is addressed. Well, what did you claim then that was special about the coating? Your Honor, we did not claim a special aspect of the coating. So do you agree with your friend on the other side that your claim is so broad that you're covering everything? Your Honor, I disagree that our claim is so broad that we're covering everything. We provided sufficient written description and enabling support to teach how to bind these nucleic acids in hybridizable form. What we're identifying is that the lack of evidence as to how in fish, because that's really the standard. We have to look at fish. Fish is the protocol that they're asserting for inherency, and if there's enough information there to understand that the bases are available. And we'd submit that there's no evidence there. Turning back to the obvious combinations, I just wanted to point out that we articulated multiple reasons why these references should not be combined, and the Board didn't address all of those. In fact, it typically just maybe one and swept it away, but there were multiple reasons, including the erroneous argument the Board made that somehow we were attacking the references individually. We have to identify the deficiencies in the references themselves to then point out why a person of ordinary skill would not have sought to combine them. And then just moving back to our arguments regarding written description, the priority with respect to VPK, I think it's critical that the Board did not address, as required in Walkopolis, the level of predictability and the knowledge of a skilled artisan, and that's critical because without those findings, it jumps straight to determining that the number of species in the original application were not sufficient to identify the entire genus. But that is a leap without having first assessed the level of predictability and the knowledge of a skilled artisan. Do you think the term is a generic term? I don't think it's necessarily a generic term, Your Honor. One last question. We know that a negatively charged phosphate backbone will bind to a positively charged support. Is there any evidence in the record why a base would bind to a positively charged support? Your Honor, there is some evidence that our expert pointed to about why there could be problems with the binding with the amines with respect to the bases. Thank you, Counsel. The case is submitted.